21CA0523 Peo in Interest of CC 12-09-2021 COLORADO COURT OF APPEALS Court of Appeals No. 21CA0523 Jefferson County District Court No. 19JV452 Honorable Ann Gail Meinster, Judge The People of the State of Colorado, Appellee, In the Interest of C.C., a Child, and Concerning S.C., Appellant. JUDGMENT AFFIRMED Division VI Opinion by JUDGE JOHNSON Fox and Welling, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced December 9, 2021 Kimberly Sorrells, County Attorney, Sarah Oviatt, Assistant County Attorney, Golden, Colorado, for Appellee Anna N.H. Ulrich, Guardian Ad Litem The Morgan Law Office, Kris P. Morgan, Colorado Springs, Colorado, for Appellant 
1 ¶ 1 In this dependency and neglect proceeding, S.C. (mother) appeals the juvenile court judgment terminating her parent-child legal relationship with C.C. (the child). We affirm. I. Background ¶ 2 In May 2019, the child, who was then five months old, was found unresponsive while in the care of mother’s boyfriend. A physician later determined that the child had sustained brain damage due to a lack of oxygen caused by unsafe sleep practices. The physician classified this as nonaccidental trauma. As a result, the Jefferson County Division of Children, Youth and Families (Division) initiated the dependency and neglect proceeding. ¶ 3 The juvenile court placed the child in the Division’s custody. And, based on mother’s admission, the court adjudicated the child dependent and neglected. The juvenile court also adopted a treatment plan that required mother to (1) participate in individual therapy to address mental health and safety issues; (2) demonstrate an understanding of the child’s needs and attend the child’s medical appointments; and (3) visit the child. ¶ 4 Later, the Division moved to terminate the legal relationship between mother and the child. After a contested hearing in late 
2 February and early March 2021, the juvenile court terminated mother’s parental rights. II. Standard of Review ¶ 5 The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent’s conduct or condition is unlikely to change in a reasonable time. § 19-3-
604(1)(c), C.R.S. 2021; People in Interest of C.H., 166 P.3d 288, 289 (Colo. App. 2007). ¶ 6 Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts. People in Interest of A.M. v. T.M., 2021 CO 14, ¶ 15. Determining the proper legal standard to be applied in a case and applying that standard to the particular facts of the case are questions of law that we review de novo. M.A.W. v. People in Interest of A.L.W., 2020 CO 11, ¶ 31. ¶ 7 We will not, however, disturb the court’s factual findings and conclusions when the record supports them. Id. at ¶ 32; see also 
3 A.M., ¶ 15. Indeed, the credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence, and the inferences and conclusions to be drawn from it are within the juvenile court’s discretion. People in Interest of C.A.K., 652 P.2d 603, 613 (Colo. 1982). III. Likelihood of Change ¶ 8 Mother contends that the juvenile court erred by concluding that she could not become a fit parent within a reasonable time. In support of her argument, mother asserts that (1) she had substantially complied with the treatment plan and (2) COVID-
related restrictions affected her ability to gain necessary skills and demonstrate that she could care for the child. We are not persuaded. A. Applicable Law ¶ 9 An unfit parent is one whose conduct or condition renders him or her unable or unwilling to give a child reasonable parental care. People in Interest of D.P., 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting sufficiently adequate to meet the child’s physical, emotional, and mental health needs. People in 
4 Interest of A.J., 143 P.3d 1143, 1152 (Colo. App. 2006). Significantly, a parent may be unfit as to one, but not all, of his or her children. People in Interest of D.L.C., 70 P.3d 584, 588 (Colo. App. 2003). ¶ 10 In determining whether a parent can become fit in a reasonable time, the court may consider whether the parent made any changes during the dependency and neglect case, the parent’s social history, and the chronic or long-term nature of the parent’s conduct or condition. D.P., 160 P.3d at 353. A reasonable time is not indefinite and must be determined by considering the child’s conditions and needs. A.J., 143 P.3d at 1152. ¶ 11 Additionally, because the child was under the age of six when the petition was filed, the expedited permanency planning provisions applied and required that he be placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, 19-
3-702(5)(c), C.R.S. 2021. B. Analysis ¶ 12 Evidence presented at the termination hearing established that the child had extensive needs. An expert in pediatrics explained that the child had sustained damage to the cell structure 
5 in his brain and his brain had stopped growing. As a result, the child • had permanent visual impairment; • would not be able to “progress like a normal child would with higher learning”; • would be unable to walk or move independently with purpose; • had extreme irritability and difficulty soothing himself; • was unable to swallow properly and relied on a G-tube for hydration, nutrition, and medication; • showed signs of abnormal muscle tone; • was at risk of joint contracture if he remained in one position for too long, which required him to be moved frequently throughout the day, and, if not monitored, would affect his ability to later be placed in a wheelchair; and • had developed two seizure conditions — myoclonic seizures as well as infantile spasms, which were hard to detect, and, if not monitored, would result in the potential of further brain damage or cardiac arrest. ¶ 13 Because of these conditions, the child needed to have his respiration, bowel sounds, heart, lungs, G-tube, and skin checked 
6 multiple times each day. He also had to be repositioned and have braces put on and off every few hours. And the child took nine medications per day, which had to be administered at three different times. ¶ 14 As a result of these severe health issues, the child required extensive medical treatment, including medical appointments, and he also participated in occupational and physical therapy three times each week. Given his severe developmental delays, he also engaged in twice weekly speech and vision therapy, as well as weekly music therapy. ¶ 15 The medical appointments required the child to visit several medical providers. Specifically, the child saw (1) a pediatrician every six months; (2) a gastroenterologist every six months; (3) an endocrinologist every year; (4) an eye doctor every six months; (5) the Nonaccidental Brain Injury Clinic (NBIC) every six months; (6) a nephrologist every year; (7) a specialist to fit his braces every six months; and (8) a neurologist specializing in epilepsy every three to six months. ¶ 16 To be sure, the juvenile court found that mother tried to engage in the services required by the treatment plan and to learn 
7 to meet the child’s needs. And the court recognized that mother had regained custody of the child’s younger sibling, born during the pendency of this case, who had been subject to a separate dependency and neglect proceeding. And the juvenile court recognized that mother could provide the child with love. Even so, the court determined that mother remained unable to meet the child’s needs. ¶ 17 The record supports this determination. Even before the child was discharged from the hospital, mother received education from the child’s therapists and nurses. A nurse care coordinator also worked with mother for more than a year to help her understand the complexity of the child’s needs and ensure that she had access to training to learn how to meet those needs. This included providing mother with information concerning available G-tube training. ¶ 18 Despite these efforts, mother failed to follow through with the G-tube training. And, in late 2019, mother missed an in-person appointment for the child at the NBIC clinic. At a different medical appointment, mother refused to receive hands-on training regarding how to administer a shot to treat the child’s infantile spasms. 
8 Mother said she could not stand to watch the child get an injection and left the room. ¶ 19 After the onset of the COVID-19 pandemic in March 2020, the nature of some of these services changed. For example, mother was only able to have video visits with the child for many months. Similarly, most of the child’s medical and therapeutic appointments were conducted via video. But mother was still able to participate in these medical appointments and the Division arranged for one weekly session of the child’s physical and vision therapies to occur during mother’s video visits with the child. The Division scheduled these therapies to coincide with the mother’s visitation via video to assist educating the mother about caring for the child. ¶ 20 Mother correctly points out that a psychologist who evaluated her concluded that she likely had difficulty learning skills via video because she was in the lower end of the borderline range of intellectual functioning. The psychologist explained that mother was a “hands-on learner” and needed “one-to-one teaching” and repetition. ¶ 21 Regardless, the record establishes that mother continued to miss opportunities to demonstrate that she could meet the child’s 
9 needs. An expert in pediatric rehabilitation explained that it was critical for the child to consistently attend medical and therapeutic appointments. Yet, mother attended just two of the child’s twenty-six medical appointments that occurred via video between May and November 2020. She also failed to attend the child’s vision appointment the next month. And mother missed another two medical appointments for the child in early 2021. ¶ 22 Indeed, mother agreed that she had missed a lot of the child’s medical appointments because she was “going through a very dark phase” before the child’s younger sibling was returned to her care. Mother also acknowledged that she still needed training related to using the G-tube, as well as learning about the child’s seizures. And mother testified that she would need to become more familiar with the child’s new medications. ¶ 23 The caseworker further explained that mother had recently reported that she was uncomfortable speaking to the child’s medical treatment providers. The nurse care coordinator likewise testified that mother indicated that she was intimidated by the use of medical terminology and the number of people present at the child’s medical appointments. 
10 ¶ 24 Separate from the record support that mother was unable to handle the child’s extensive life-long medical needs, mother does not challenge the juvenile court’s determination that the child would not be safe in her care because she continued to live with the same boyfriend who was responsible for the child’s trauma. The record supports that, although mother acknowledged that the child was severely injured while in the care of her boyfriend, she minimized the injuries or care the child would need for the rest of his life and instead chose to attend the boyfriend’s criminal hearings rather than the child’s medical appointments. And the record supports that some of the child’s injuries did not result from unsafe sleeping practices, as a physician opined that the bruising was indicative of the child being hit or slapped on the face. Mother seemed unable to recognize the risk posed to the child by staying with the boyfriend, despite the boyfriend’s past behavior of passing out and leaving the child crying in his crib unattended. ¶ 25 Under these circumstances, we will not disturb the juvenile court’s determination that mother’s condition as an unfit parent was unlikely to change in a reasonable time. 
11 IV. Conclusion ¶ 26 The judgment is affirmed. JUDGE FOX and JUDGE WELLING concur.